**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BECKLEY DIVISION**

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**

                                      **CIVIL ACTION NO.** <u>5:25-cv-00585</u>

**GEORGE SPADARO,
LOCUST MEDICAL, LLC,
SUMMERS MEDICAL SUPPLY, LLC, and
EASTERN MEDICAL SUPPLY, LLC**

        **Defendants.**

## C O M P L A I N T

      The United States of America brings this action against George Spadaro, Locust Medical, LLC, Summers Medical Supply, LLC, and Eastern Medical Supply, LLC, under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, and the common law seeking damages, civil penalties, and restitution.

### PARTIES

      1.      The Plaintiff is the United States of America ("United States").

      2.      Defendant George Spadaro ("Spadaro") currently resides in the Philippines where he organized and has remotely managed and conducted the day-to-day operations of Locust Medical, LLC, Summers Medical Supply, LLC, and Eastern Medical Supply, LLC (collectively, the "Spadaro Entities").

      3.      Defendant Locust Medical, LLC is a limited liability company organized under the laws of West Virginia with a principal office address of P.O. Box 315, Hinton, WV 25951.

4.      Defendant Summers Medical Supply, LLC is a limited liability company organized under the laws of West Virginia with its principal office address located at 110 Main St., Beckley, WV 25801.

5.      Defendant Eastern Medical Supply, LLC is a limited liability company organized under the laws of West Virginia with its principal office address located at 110 Main St., Beckley, WV 25801.

## JURISDICTION AND VENUE

6.      This action is properly in the United States District Court for the Southern District of West Virginia pursuant to 28 U.S.C. § 1345.

7.      Venue is proper pursuant to 28 U.S.C. § 1391.

## FACTS

### *The Medicare Program*

8.      At all times relevant to this Complaint, the Medicare Program ("Medicare") was a federal health care program providing benefits to individuals who were the age of 65, or order, or disabled.   Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. The benefits available under Medicare were governed by federal statutes and regulations. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

9.      Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f).

10.      Medicare was divided into four parts which helped cover specific services: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription

drug benefits (Part D).

11.    Specifically, Medicare Part B covered medically necessary physician office services and outpatient care, including the ordering of durable medical equipment, prosthetics, orthotics, and supplies (collectively, "DME" or "DMEPOS") that were ordered by licensed medical doctors or other qualified health care providers.

12.    Physicians, clinics, laboratories, and other health care providers that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

13.    To receive Medicare reimbursement, providers had to fill out an application and execute a written provider agreement, known as a CMS Form 855. The application contained certifications that the provider agreed to abide by the Medicare laws and regulations, and that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity." Medicare providers were given access to Medicare manuals and service bulletins describing procedures, rules, and regulations.

14.    Each Medicare beneficiary was identified with a unique beneficiary identifier number known as a "BIN." These BINs were used, among other ways, to submit claims to Medicare seeking reimbursement for covered benefits, items, and services. BINs were considered means of identification pursuant to 18 U.S.C. § 1028(d)(7).

15.    CMS contracted with CGS Administrators, LLC, to receive, adjudicate, process, and pay Part B claims, including claims for DME.

***Durable Medical Equipment***

16.     Medicare covered an individual's access to DME, such as off-the-shelf ("OTS") ankle braces, knee braces, back braces, elbow braces, wrist braces, and hand braces (collectively, "braces").   OTS braces required minimal self-adjustment for appropriate use and did not require expertise in trimming, bending, molding, assembling, or customizing to fit the individual.

17.     A claim for DME submitted to Medicare qualified for reimbursement only if it was medically necessary for the treatment or diagnosis of the beneficiary's illness or injury and prescribed by a licensed physician.   In claims submitted to Medicare for the reimbursement of provided DME, providers were required to set forth, among other information, the beneficiary's name and unique Medicare identification number (BIN), the equipment provided to the beneficiary, the date the equipment was provided, the cost of the equipment, and the name and provider number of the provider who prescribed or ordered the equipment.   To be reimbursed for Medicare DME, the claim had to be reasonable, medically necessary, documented, and actually provided as represented to Medicare.

18.     Medicare claims were required to be properly documented in accordance with Medicare rules and regulations. For certain DME products, Medicare promulgated additional requirements that a DME order was required to meet for an order to be considered "reasonable and necessary."

***DME Master List and Face-to-Face Encounter Requirements***

19.     Effective January 1, 2020, CMS published regulations codified at 42 C.F.R. § 410.38, establishing a "Master List" of DME items from which specific DME items could be designated for heightened prescribing requirements, including the requirement that a prescribing physician conduct a face-to-face encounter with the patient prior to ordering the DME. Title 42,

C.F.R. § 410.38(d)(2) states as follows: "Items Requiring a Face-to-Face Encounter. For [power mobility devices] and other [DME, prosthetics, orthotics, and supplies ("DMEPOS")] items selected for inclusion on the Required Face-to–Face Encounter and Written Order Prior to Delivery List, the treating practitioner must document **and communicate to the DMEPOS supplier** that the treating practitioner has had a face-to-face encounter with the beneficiary within the 6 months preceding the date of the written order/prescription."

20.    DME items requiring a face-to-face encounter included the following:

| HCPCS | HCPCS Code Description |
|---|---|
| L0637 | Lumbar-sacral orthosis (LSO), sagittal-coronal control, with rigid anterior and posterior frame/panels, posterior extends from sacrococcygeal junction to T-9 vertebra, lateral strength provided by rigid lateral frame/panels, produces intracavitary pressure to reduce load on intervertebral discs, includes straps, closures, may include padding, shoulder straps, pendulous abdomen design, prefabricated item that has been trimmed, bent, molded, assembled, or otherwise customized to fit a specific patient by an individual with expertise |
| L0648 | Lumbar-sacral orthosis, sagittal control, with rigid anterior and posterior panels, posterior extends from sacrococcygeal junction to t-9 vertebra, produces intracavitary pressure to reduce load on the intervertebral discs, includes straps, closures, may include padding, shoulder straps, pendulous abdomen design, prefabricated, off-the-shelf |
| L0650 | Lumbar-sacral orthosis, sagittal-coronal control, with rigid anterior and posterior frame/panel(s), posterior extends from sacrococcygeal junction to t-9 vertebra, lateral strength provided by rigid lateral frame/panel(s), produces intracavitary pressure to reduce load on intervertebral discs, includes straps, closures, may include padding, shoulder straps, pendulous abdomen design, prefabricated, off-the-shelf |
| L0651 | Lumbar-sacral orthosis (LSO), sagittal-coronal control, rigid shell(s)/panel(s), posterior extends from sacrococcygeal junction to T-9 vertebra, anterior extends from symphysis pubis to xyphoid, produces intracavitary pressure to reduce load on the intervertebral discs, overall strength is provided by overlapping rigid material and stabilizing closures, includes straps, closures, may include soft interface, pendulous abdomen design, prefabricated, off-the-shelf |
| L1686 | Hip orthosis, abduction control of hip joint, postoperative hip abduction type, custom fabricated |

| | |
|---|---|
| L1690 | Combination, bilateral, lumbo-sacral, hip, femur orthosis providing adduction and internal rotation control, prefabricated, includes fitting and adjustment |
| L1851 | Knee orthosis (ko), single upright, thigh and calf, with adjustable flexion and extension joint (unicentric or polycentric), medial-lateral and rotation control, with or without varus/valgus adjustment, prefabricated, off-the-shelf |
| L1852 | Knee orthosis (KO), double upright, thigh and calf, with adjustable flexion and extension joint (unicentric or polycentric), medial-lateral and rotation control, with or without varus/valgus adjustment, prefabricated, off-the-shelf |
| L3761 | Elbow orthosis (EO), with adjustable position locking joint(s), prefabricated, off-the-shelf |
| L3960 | Shoulder elbow wrist hand orthosis, abduction positioning, airplane design, prefabricated, includes fitting and adjustment |
| L3961 | Shoulder elbow wrist hand orthosis, shoulder cap design, without joints, may include soft interface, straps, custom fabricated, includes fitting and adjustment |

21.　　The term "[f]ace-to-face encounter" was defined as "an in-person or telehealth encounter between the treating practitioner and the beneficiary." 42 C.F.R. § 410.38(c)(5).

22.　　Title 42, C.F.R. § 410.38(d)(2)(ii) specified that "[i]f it is a telehealth encounter, the requirements of §§ 410.78 and 414.65 of this chapter must be met."

23.　　Title 42, C.F.R. § 410.78(b) specified that "Medicare Part B pays for covered telehealth services included on the telehealth list when furnished by an interactive telecommunications system . . . . "

24.　　With limited exceptions not relevant here, "[i]nteractive telecommunications system" was defined as "multimedia communications equipment that includes, at a minimum, audio and video equipment permitting two-way, real-time interactive communication between the patient and distant site physician or practitioner."　42 C.F.R. § 410.78(a)(3).

## THE DEFENDANTS' CONDUCT

### *Locust Medical, LLC*

25.     Locust Medical, LLC ("LM") was registered with the West Virginia Secretary of State on April 8, 2020.  The sole member identified on the West Virginia Secretary of State's official website is George Spadaro.

26.     LM enrolled in Medicare on April 24, 2020, and began submitting claims to Medicare on May 8, 2020, for payment for DME purportedly provided to Medicare beneficiaries.

27.     LM ceased operations and the submission of claims to Medicare on March 13, 2023.

### *Summers Medical Supply, LLC*

28.     Summers Medical Supply, LLC ("SMS") was registered with the West Virginia Secretary of State on September 23, 2021.  The sole member identified on the West Virginia Secretary of State's official website is George Spadaro.

29.     SMS enrolled in Medicare on May 20, 2022, and began submitting claims to Medicare on June 14, 2022, for payment for DME purportedly provided to Medicare beneficiaries.

### *Eastern Medical Supply, LLC*

30.     Eastern Medical Supply, LLC ("EMS") was registered with the West Virginia Secretary of State on March 21, 2023.   The sole member identified on the West Virginia Secretary of State's official website is George Spadaro.

31.     EMS attempted to enroll in Medicare on April 15, 2024, but was denied enrollment because it was not in compliance with Medicare requirements at the time of the initial site visit. EMS reapplied for enrollment, which was granted on October 31, 2024.

### *Defendants' Scheme to Defraud Medicare*

32.    Spadaro formed, enrolled, and managed the day-to-day operation of the Spadaro Entities in order to bill Medicare for DME provided or purportedly provided to Medicare Beneficiaries.   To do this, Spadaro and the Spadaro Entities employed marketers and marketing companies who contacted Medicare beneficiaries and/or facilitated the acquisition of "raw leads" including Medicare beneficiary identification information needed to bill Medicare.

33.    As demonstrated by numerous complaints filed by Medicare beneficiaries contacted on the Defendants' behalf, these marketers frequently used deceptive and manipulative techniques to obtain beneficiary information such as using phone numbers and telecommunication technology to make calls appearing to be from Medicare, by representing to beneficiaries that they were in fact calling on behalf of Medicare, by requesting Medicare beneficiary identification information to purportedly provide new Medicare cards, by repeatedly calling beneficiaries after services had been refused, and by purchasing Medicare beneficiary information from third parties to bill Medicare for DME that was not requested, needed, or wanted by the beneficiary.

### *George Spadaro Recruited Doctors Online to Prescribe DME*

34.    Spadaro, on behalf of the Spadaro Entities, established relationships with various physicians whom he used to obtain prescriptions and/or orders for DME for the Medicare beneficiaries identified through these marketing efforts. Specifically, Spadaro regularly and personally contacted and communicated with the physicians and instructed them regarding requirements for ordering DME.   Spadaro personally communicated to physicians that they could issue orders for DME based only on review of the medical information provided by Spadaro and the Spadaro Entities.

35.    In the last five years, the CMS Benefit Integrity Unit ("BIU") has received

approximately 385 complaints from Medicare beneficiaries relating to DME provided by LM, and another 168 complaints relating to DME provided by SMS. A large proportion of these complaints state that the beneficiary received a DME item in the mail but did not need or want the DME and had never heard of the ordering physician or the company providing the DME.

36.     Physicians interviewed by investigators confirmed that some beneficiaries called their offices expressing the same complaints about fraud and that these calls were referred directly to Spadaro. Accordingly, Spadaro had directly knowledge of these complaints, his marketers' deceptive practices, and lack of medical necessity, but he continued to bill Medicare for these items.

37.     In numerous cases Medicare beneficiaries reported sending the DME back to the Defendants, but Medicare was never refunded amounts it had paid.

38.     Federal agents interviewed Dr. Oluremi Ilupeju about his relationship with SMS. Dr. Ilupeju admitted that he did not see any of the patients in person or conduct a physical exam or telehealth appointment prior to issuing DME orders.

39.     Dr. Ilupeju stated that patient encounters were initiated when he was contacted by Defendants' representative by phone along with someone on the line claiming to be a patient.   Dr. Ilupeju stated that he would then ask a series of question to each patient.   These telephone visits were not scheduled, but Dr. Ilupeju would receive phone calls throughout the day, ranging from three to ten calls a day for telephone visits from SMS.   According to Dr. Ilupeju, all of the individuals calling on behalf of the Defendants had what he believed to be a Filipino accent.

40.     According to Dr. Ilupeju, he received an intake form for each patient used to determine if DME was medically necessary from an email account belonging to George Spadaro. The form had the patient's information pre-filled, including Medicare BIN.

41.     According to Dr. Ilupeju, approximately 5% of the patients SMS referred to him questioned the legitimacy of the call, asking him if it was a scam and declining any DME.

42.      Dr. Ilupeju reported that he received communications from Novitas, an interactive telehealth provider, regarding a patient claiming that they did not receive a telehealth visit and did not want a brace prescribed to them.

43.     Dr. Ilupeju stated that he did not receive payments directly from SMS but billed Medicare for the phone encounters.

44.     Dr. Govind Seth was interviewed by federal agents regarding his relationship with LM.   Dr. Seth admitted that he did not see any of the patients in person or conduct a physical exam or telehealth appointment.   Dr. Seth reported that George Spadaro had instructed him that he could prescribe DME to Medicare beneficiaries if he had reviewed the patient's medical chart and deemed it necessary based on the medical history and the information provided. Dr. Seth reported that he was paid $20 to $30 for each prescription that he issued.

45.     Dr. Seth said that there were only a few times that he did not prescribe the DME as requested by Spadaro, but "most of the time" issues arose after the fact when he received calls from patients or a patient's family member who said the patient did not need the DME.   Dr. Seth reported that he would forward these complaints to Spadaro.

46.     CMS BIU received numerous substantially identical complaints from Medicare beneficiaries reporting that LM billed Medicare for DME that was not medically necessary or desired.   As with SMS, numerous beneficiaries were interviewed by federal agents, and the beneficiaries denied that they had ever heard of LM or Dr. Govind Seth.

### *Dr. Martin Perlin Indictment*

47.     Dr. Martin Perlin was identified as the referring provider on 7,930 claims submitted

to Medicare by LM, SMS, and EMS, totaling $9,909,529.82 between July 8, 2022, and July 17, 2025.

48.     Dr. Perlin was identified as the referring provider associated with 170 beneficiary complaints submitted to CMS (77 for LM, 93 for SMS).

49.     On July 31, 2025, Dr. Perlin was arrested by federal agents and charged in the United States District Court for the Eastern District of Michigan (*see* Indictment, *United States v. Biricik*, No. 5:25-cr-20543 (E.D. Mich July 22, 2025), Dkt. No. 1) for his involvement in a separate $500 million healthcare fraud conspiracy involving his ordering of fraudulent medical tests for patients with which he had no treating relationship.    As a result of the investigation into Dr. Perlin, investigators have not been able to interview him to date regarding the allegations described in this Complaint, but the Government anticipates that devices, emails, text messages, documents, and other evidence seized during the investigation will reveal significant additional facts relevant to this Complaint and the conduct of Spadaro and the Spadaro Entities.

### *Locust Fraudulent Billing to Medicare*

50.     Claims submitted to Medicare by LM primarily identified Dr. Govind Seth, a family medicine practitioner in Dundalk, Maryland; Dr. Oluremi Ilupeju, an obstetrics and gynecologist in Silver Spring, Maryland; and Dr. Martin Perlin, a hematologist in Mount Kisco, New York, as the referring and ordering physicians for the DME provided to Medicare beneficiaries and billed to Medicare.

51.     Between May 8, 2020, and March 13, 2023, LM submitted false or fraudulent claims to Medicare for reimbursement for DME supplies that were not medically necessary and were billed in violation of Medicare statutes, regulations, and polices.

52.     Between May 8, 2020, and March 13, 2023, Locust submitted 4,528 claims to

Medicare for DME items included on the CMS Face-to-Face Encounter List where Dr. Perlin was identified as the referring provider but where he did not conduct a face-to-face encounter with the Medicare beneficiary as required.   LM was paid $2,357,655.58 by Medicare as a result of these claims.

53.     Between May 8, 2020, and March 13, 2023, LM submitted 8,675 claims to Medicare for DME items included on the CMS Face-to-Face Encounter List where Dr. Seth was identified as the referring provider but where he did not conduct a face-to-face encounter with the Medicare beneficiary as required.   LM was paid $3,990,521.03 by Medicare as a result of these claims.

54.     Between May 8, 2020, and March 13, 2023, LM submitted four (4) claims to Medicare for DME items included on the CMS Face-to-Face Encounter List where Dr. Ilupeju was identified as the referring provider but where he did not conduct a face-to-face encounter with the Medicare beneficiary as required.   LM was paid $2,601.84 by Medicare as a result of these claims.

### *Medicare Fraud Hotline Complaints - LM*

55.     Between July 21, 2020, and June 4, 2024, the CMS BIU received 385 fraud hotline complaints from Medicare beneficiaries reporting that they had received DME from LM that they did not need or order and that Medicare was fraudulently billed for DME without their consent. Many of the complaints confirmed that they had never heard of LM or the ordering physician. The following summarizes a small selection of those complaints:

| Date of Complaint | Allegation | Beneficiary Initials | Amount Billed | Dates of Service |
|---|---|---|---|---|
| 23Apr2024 | THE BENEFICIARY DID NOT ORDER THESE BRACES AND DOES NOT KNOW THE SUPPLIER OR THE REFERRING PROVIDER. | DR | $1,300.00 | 2/11/2022 |
| 04Apr2024 | THESE ARE FRAUDULENT CLAIMS BENEFICIARY NEVER RECEIVED OR ORDERED ANY OF THESE | SA | $5,100.00 | 10/15/2021, 10/19/2021 |

| | | | | |
|---|---|---|---|---|
| | SUPPLIES AND DOES NOT KNOW THE SUPPLIER OR ORDERING PROVIDER. | | | |
| 14Dec2023 | PROVIDER USED A DOCTOR'S NAME THAT THE BENEFICIARY NEVER HEARD OF AS ORDERING THIS BACK BRACE.   THE DOCTOR THEY USED AS THE ORDERING PHYSICIAN IS LOCATED IN NEW YORK AND THE BENEFICIARY LILVES IN OKLAHOMA.   THE BENEFICIARY CANNOT USE THE BACK BRACE AND SHE HAD NO IDEA THAT MEDICARE WAS BILLED FOR IT. | EW | $1,500.00 | 1/24/2023 |
| 16Aug2023 | BENEFICIARY DID NOT ORDER BRACES BILLED. SHE RETURNED THE SUPPLIES ON APRIL 17, 2023, NO CORRECT MADE TO THE CLAIM. COPIES OF PICK-UP SLIP INCLUDED IN WRITTEN CORRESPONDENCE JOB. | LB | $1,100.00 | 1/31/2023 |
| 06Jul2023 | BENE DOES NOT KNOW PROVIDER AND DID NOT RECEIVE BRACE NOR DOES SHE NEED ONE | LP | $1,500.00 | 1/12/2023 |
| 28Jun2023 | BENEFICIARY RECEIVED THESE ITEMS THAT HE DID NOT ORDER.   BENEFICIARY RECEIVED A CALL FROM PROVIDER, AND THEY OFFERED THESE ITEMS. | AO | $900.00 | 2/16/2023 |
| 30May2023 | BENEFICIARY DID NOT ORDER THIS BRACE. | SH | $1,500.00 | 2/27/2023 |
| 22May2023 | ON 2/16/2023 LOCUST MEDICAL LLC HAS BILLED MEDICARE FOR ITEMS THAT WERE NEVER PROVIDED ARE REQUESTED ARE AUTHORIZE | HL | $1,300.00 | 2/16/2023 |
| 17May2023 | UNAUTHORIZED PERSON REPORTING, BENEFICIARY DOES NOT KNOW THIS PROVIDER NOR DID SHE ORDER OR COULD NOT ORDER L1690; HOWEVER, SHE DID RECEIVE THE EQUIPMENT. PROVIDER HAS MULTIPLE BIU ESCALATIONS. NO ATTEMPT TO CONTACT PROVIDER. | EB | $2,000.00 | 1/6/2023 |
| 02May2023 | STATES THAT THESE BRACES WERE NOT ORDERED OR REQUESTED. HE STATES THAT HE WILL SEND THESE ITEMS BACK. STATES BENEFICIARY DOES NOT HAVE ANKLE PROBLEMS. RECEIVED ITEMS THAT WERE NOT ORDERED. | CH | $1,300.00 | 1/10/2023 |
| 20Apr2023 | BENEFICIARY STATED THAT SHE HAS NO MEDICAL NEEDS THAT REQUIRE THESE BRACES, SHE DOES NOT RECOGNIZE THE DOCTOR, OR SUPPLIER. BENEFICIARY STATED THAT SHE DID RECEIVE THE BRACES, BUT SHE GOT IT RETURN BY US POSTAL MAIL. | UB | $2,800.00 | 12/09/2022, 12/12/2022 |
| 11Apr2023 | BENE HAS SPOKEN WITH PEOPLE THAT SENT ITEMS, TOLD THEM NOT TO. BENE DOES NOT WANT OR NEED ANY OF THE ITEMS | IB | $2,600.00 | 1/25/2023 |
| 30Mar2023 | THE BENE STATED THE ITEMS ASSOCIATED WITH THIS CLAIM WASN'T ORDERED BY HIM NOR HIS DOCTOR & ALSO THAT HE IS NOT FAMILIAR WITH THE RENDERING SUPPLIER & HAS NEVER BEEN ASSOCIATED WITH THEM OR ORDERED ANYTHING FROM THEM IN THE PAST. HE DID RECEIVE THE ITEMS ASSOCIATED WITH THIS | KD | $2,800.00 | 1/30/2023, 2/2/2023 |

| | | | | |
|---|---|---|---|---|
| | CLAIM HOWEVER, HE SENT THEM BACK TO THE SUPPLIER. | | | |
| 17Mar2023 | THE BENEFICIARY DID NOT ORDER THESE ITEMS. HE RECEIVED A PHONE CALL TELLING HIM HE WAS ELIGIBLE TO RECEIVE FREE MEDICAL EQUIPMENT WHICH HE REFUSED. HE WAS SENT THE EQUIPMENT. WHEN HE TRIED TO CALL THE SUPPLIER IT WAS A NON WORKING NUMBER | DF | $7,500.00 | 11/18/2021, 11/20/2021, 12/01/2022 |
| 14Mar2023 | RECEIVED DME ITEMS/MULTIPLE SUPPORT DEVICES THAT WERE NOT NEEDED AS A RESULT OF TELEMARKETING SCAM. SENT ALL OF THE ITEMS BACK, BUT CLAIM IS STILL OUTSTANDING. PROVIDER WAS NOT CONTACTED BUT HAS MULTIPLE BIU, DID NOT WANT TO CONTACT THE SUPPLIER DUE TO FEAR OF MORE FRAUD. | WP | $900.00 | 8/22/2022 |
| 14Mar2023 | BENEFICIARY RECEIVED THESE BRACES THAT SHE NEVER ORDERED. A MEDICARE CSR DID A 3-WAY CALL WITH THE SUPPLIER WHO SAID THEY WOULD MAIL OUT A PREPAID SHIPPING LABEL. BENEFICIARY HAS HEARD NOTHING SINCE, AND NEVER GOT THE LABEL. BENEFICIARY DOES NOT WANT THE BRACES - JUST WANTS TO RETURN THEM. | CS | $2,100.00 | 2/24/2023, 3/1/2023 |
| 10Mar2023 | CALLER STATES   ALTHOUGH SHE DID RECEIVE A PHONE CALL FROM A COMPANY-ASKING HER FOR HER MEDICARE NUMBER-WHICH BENEFICIARY DID NOT GIVE. THEY SAID THEY WOULD LIKE TO SEND HER ITEMS AT NO COST TO HER. WHEN SHE RECEIVED THE ITEMS, SHE KNOWS SHE CANNOT USE THEM. HAS TRIED TO CALL THEM MULTIPLE TIMES AND ONLY THING SHE HAS OPTION TO DO IS LEAVE A MESSAGE AND THEY HAVE NOT CALLED HER BACK. THE DOCTOR LISTED ON CLAIM IS NOT HER DOCTOR. | HF | $2,400.00 | 2/10/2023 |
| 10Mar2023 | BENEFICIARY DOES NOT KNOW THIS PROVIDER NOR DID SHE ORDER ANY DME BRACE. BENEFICIARY RECEIVED A PACKAGE FROM THIS PROVIDER SEVERAL WEEKS AGO. SHE HAS NOT OPENED THE PACKAGE AND WILL BE HAVING HER NIECE RETURN PACKAGE TO SENDER: | LS | $1,500.00 | 12/28/2022 |
| 28Feb2023 | GOT NOTHING AND DOES NOT NEED | DD | $1,300.00 | 2/7/2023 |
| 24Feb2023 | MS. JULIA DAVID IS STATING THAT SHE DID NOT NEED, DID NOT ORDER & DID NOT RECEIVE THIS ITEM ON THIS DATE FROM THIS SUPPLIER. MS. DAVID BELIEVES THAT NEITHER SHE NOR MEDICARE SHOULD BE RESPONSIBLE FOR THIS CHARGE. | JD | $900.00 | 9/7/2022 |
| 01Oct2022 | BENEFICIARY DID NOT ORDER THIS EQUIPMENT. SHE DOES NOT RECOGNIZE THE ORDERING DOCTOR NOR THE SUPPLIER. SHE IS RECEIVING MULTIPLE CALLS A DAY AND IS BEING | JF | $2,900.00 | 7/13/2022 |

| | THREATENED TO TAKE THIS EQUIPMENT SHE DOES NOT NEED. | | | |
|---|---|---|---|---|

56.    Federal investigators followed up with a number of these complainants for interviews.

57.    Beneficiary "PE" was interviewed by federal agents and reported that she had received a call in January 2023 from an individual claiming to work for Medicare and who already had her personal information including address and BIN.   The caller quizzed "PE" regarding her physical condition, and she agreed to receive two wrist braces to help with a condition she had. The caller did not conduct any physical examination or ask for measurements to determine the size of the braces, and the braces "PE" ultimately received in the mail did not fit.   "PE" contacted LM at least four times in an attempt to send the braces back, and she ultimately did ship them back. "PE" later had surgery on her hand and was prescribed braces by her primary care physician, but the claim was denied by Medicare due to the claim previously submitted by LM and not refunded. As a result of LM sending braces "PE" did not need and billing Medicare, "PE" was forced to pay out of pocket for braces she actually did need.   "PE" reported that her Medicare was billed for a telehealth visit with Dr. Martin Perlin but that she never heard of him and never had a telehealth visit in her life.   Despite the lack of physician-patient relationship or face-to-face encounter, LM billed Medicare $1,000.00 and was paid $755.57 for the DME provided to beneficiary "PE."

58.    Beneficiary "CL" was interviewed by federal agents and reported that she had received a series of calls from an individual with a foreign accent asking about various medical conditions and trying to get her to agree that she needed braces.   The caller already had her personal information, including her BIN.   "CL" stated that she did not need braces and never

spoke to a medical provider, but she later received a box of braces from LM. "CL" reported that she had never heard of Dr. Govind Seth, the referring provider identified in LM's claims to Medicare.   Despite the lack of physician-patient relationship or encounter or any medical necessity for DME, Locust billed Medicare $1,300.00 and was paid $891.82 for the DME provided to beneficiary "CL."

### SMS Fraudulent Billing to Medicare

59.    Claims submitted to Medicare by SMS primarily identified Dr. Govind Seth, a family medicine practitioner in Dundalk, Maryland; Dr. Oluremi Ilupeju, an obstetrics and gynecologist in Silver Spring, Maryland; and Dr. Martin Perlin, a hematologist in Mount Kisco, New York, as the referring and ordering physicians for the DME provided to Medicare beneficiaries and billed to Medicare.

60.    Between July 14, 2022, and September 18, 2024, SMS submitted false or fraudulent claims to Medicare for reimbursement for DME supplies that were not medically necessary and were billed in violation of Medicare statutes, regulations, and polices.

61.    Between July 14, 2022, and September 18, 2024, SMS submitted 3,335 claims to Medicare for DME items included on the CMS Face-to-Face Encounter List where Dr. Perlin was identified as the referring provider but where he did not conduct a face-to-face encounter with the Medicare beneficiary as required.   SMS was paid $1,668,318.83 by Medicare as a result of these claims.

62.    Between July 14, 2022, and September 18, 2024, SMS submitted six (6) claims to Medicare for DME items included on the CMS Face-to-Face Encounter List where Dr. Seth was identified as the referring provider but where he did not conduct a face-to-face encounter with the Medicare beneficiary as required.   SMS was paid $1,670.10 by Medicare as a result of these

claims.

63.      Between July 14, 2022, and September 18, 2024, SMS submitted 1,003 claims to Medicare for DME items included on the CMS Face-to-Face Encounter List where Dr. Ilupeju was identified as the referring provider but where he did not conduct a face-to-face encounter with the Medicare beneficiary as required.   SMS was paid $589,395.92 by Medicare as a result of these claims.

### *Medicare Fraud Hotline Complaints - SMS*

64.      Between March 20, 2023, and August 9, 2024, the CMS BIU received 168 fraud hotline complaints from Medicare beneficiaries reporting that they had received DME from SMS that they did not need or order and that Medicare was fraudulently billed for DME without their consent.   Many of the complaints confirmed that they had never heard of SMS or the ordering physician. The following summarizes a small selection of those complaints:

| Date of Complaint | Allegation | Beneficiary Initials | Amount Billed | Dates of Service |
|---|---|---|---|---|
| 12Sep2023 | THE BENEFICIARY STATED SHE NEVER ORDERED NOR RECEIVED THE ITEMS BEING BILLED:L0637 - LUMBAR-SACRAL ORTHOSIS, SAGITTAL-CORONAL CONTROL, WITH RIGID A POSTERIOR FRAME/PANELS, POSTEEFFECTIVE 12/02/2021 | R.M. | $1,500.00 | 4/19/2023 |
| 14Aug2023 | NEVER ORDERED A WRIST BRACE | M. G. | $3,500.00 | 4/25/2023, 4/26/2023 |
| 31Jul2023 | THE MEMBER DID NOT ORDER, NOR DID THEY RECEIVE THESE ITEMS. | J. S. | $1,500.00 | 5/1/2023 |
| 19Jul2023 | SHE RETURNED THE ITEMS AND NO REFUND WAS GIVEN. WOULD LIKE THIS INFORMATION INVESTIGATED. | F. P. | $1,500.00 | 5/2/2023 |

| | | | | |
|---|---|---|---|---|
| 11Jul2023 | THE BENEFICIARY HAS NO REASON FOR A BACK BRACE NOR HAS SHE RECEIVED OR AUTHORIZED THE ORDER. | K. C. | $1,500.00 | 3/16/2023 |
| 05Jul2023 | THE BENE DID NOT ORDER ANY BRACES AND DOES NOT KNOW ANY OF THESE   COMPANIES | P. E. | $900.00 | 5/9/2023 |
| 28Jun2023 | THE BENEFICIARY DOES NOT KNOW THE PROVIDER. PLEASE ASSIST. HE RECEIVED AND RETURNED THE FREE ITEMS, BUT NO REFUND TO MEDICARE. PLEASE ASSIST. | R. C. | $2,300.00 | 4/4/2023 |
| 20Jun2023 | BENE WANTS TO REPORT FRAUD, BENE DIDN'T ORDER BRACE. ITEM WAS RETURNED. DOS 4-7-23 SUMMERS MEDICA L SUPPLY | C. D. | $1,500.00 | 4/7/2023 |
| 16Jun2023 | BENEFICIARY IS CALLING TO REPORT FRAUD SERVICES APPEARING ON THEIR MSN FOR ITEM NEVER REQUESTED OR ORDERED THE SUPPLIER/PROVIDER ISNT RECOGNIZED | D.R. | $1,100.00 | 3/27/2023 |
| 13Jun2023 | CALLER WAS FORCED TO ACCEPT BRACES SHE DID NOT WANT. BRACES WERE SENT BACK TO DME COMPANY 6/5/23 AND RECEIVED 6/8/23. | S. C. | $3,800.00 | 5/8/2023 |
| 07Jun2023 | BENEFICIARY STATES SHE RECEIVED A BACK BRACE IN THE MAIL THAT SHE DID NOT ORDER. SHE STATES SHE DOES NOT KNOW SUPPLIER OR PROVIDER WHO ORDERED IT LISTED ON HER MSN.   BENEFICIARY SEEKS TO REPORT FRAUD. | E.M. | $1,500.00 | 3/22/2023 |
| 05Jun2023 | MRS. ROBERTS IS CALLING ON BEHALF OF HER MOTHER BECAUSE SHE NOR HER DOCTOR ORDERED THE BRACES. PLEASE INVESTIGATE AND THANK YOU. | A. K. | $1,100.00 | 3/23/2023 |
| 30May2023 | BENEFICIARY DID NOT ORDER ANY SUPPLIES NOR DID HER PROVIDER. SHE IS NOT FAMILIAR WITH THIS COMPANY'S NAME SO SHE DID NOT CALL THEM. SHE ONLY CALLED MEDICARE TO REPORT FRAUD. | B.G. | $900.00 | 3/8/2023 |

| | | | | |
|---|---|---|---|---|
| 26May2023 | MEMBER STATED THAT HE HAS NO MEDICAL NEED FOR THIS EQUIPMENT, HE DOES NOT RECOGNIZE THE SUPPLIER OR THE DOCTOR, AND HE NEVER RECEIVED THE MEDICAL EQUIPMENT. | J. R. | $3,700.00 | 3/6/2023, 3/9/2023, 4/5/2023 |
| 24May2023 | CALLER STATES THAT THESE ITEMS WERE NOT REQUESTED OR ORDERED. TRIED CALLING THE SUPPLIER AND NO ANSWER. SUMMERS MEDICA L SUPPLY, 5/9/2023, 23131718742000. L3960. | P. E. | $900.00 | 5/9/2023 |
| 09May2023 | BENE STATES THESE ITEMS WERE NEITHER ORDERED NOR RECEIVED. BENE ALSO STATES THEY DO NOT KNOW THE SUPPLIER OR THE REFERRING DOCTOR. SUPPLIER IS COMMON TO BIUS AND HAS FLAGS ON RECORD. | J. B. | $4,000.00 | 3/3/2023 |
| 09May2023 | THE BENEFICIARY RECEIVED THE ITEM, SHE DIDN'T ORDER IT. SHE TRIED TO REACH OUT TO SUPPLIER TO RETURN IT BUT THEY DON'T RESPOND. | V. I. | $1,300.00 | 3/16/2023 |
| 26Apr2023 | DID NOT AGREE TO THE BRACE | R.M. | $1,500.00 | 4/19/2023 |
| 29Mar2023 | FRAUDULENT ACTIVITY, DID NOT NEED, NEVER ORDERED,   NEVER RECEIVED.   THANK YOU., | L. B. | $2,400.00 | 3/1/2023 |
| 28Sep2023 | DID NOT ORDER THIS EQUIPMENT.DID NOT RECEIVE THIS EQUIPMENT.DOES NOPT NEED THIS EQUIPMENT. | J.N. | $3,600.00 | 8/7/2023 |
| 20Sep2023 | THE BENEFICIARY RECEIVED BRACES THAT WERE NOT ORDERED BY HER OR THE DOCTOR. THE BENEFICIARY INDICATES THAT THERE'S NO NEED FOR HER TO HAVE BRACES. | R. G. | $4,150.00 | 5/10/2023 |

65.     Federal investigators interviewed a number of these complainants to confirm the details of their interactions with SMS.

66.     Beneficiary "SS" was interviewed on August 14, 2024, and reported that they had received two or three DME items in the mail within the last year that they did not request.   "SS"

informed investigators that they had never interacted with or heard of the referring physician, Dr. Oluremi Ilupeju, or anyone associated with his practice. "SS" denied ever interacting with SMS and denied ever having a telehealth visit. Despite the lack of physician-patient relationship or face-to-face encounter, SMS billed Medicare $1,200.00 for the DME provided to beneficiary "SS."

67.    Beneficiary "SJ" was interviewed on August 14, 2024, and reported that they had received two DME products that they did not order or request from their doctor. "SJ" stated that they had never heard of SMS and had never spoken to or heard of the ordering physician, Dr. Martin Perlin. "SJ" denied ever interacting with SMS and denied ever having a telehealth visit. Despite the lack of physician-patient relationship or face-to-face encounter, SMS billed Medicare $3,600.00 for DME provided to beneficiary "SJ."

68.    Beneficiary "LR" and their child "TP" were interviewed on August 21, 2024. "LR" had never heard of SMS or the ordering physician, Dr. Martin Perlin. "LR" reported that they had no knowledge of SMS or Dr. Perlin. "LR" recalled being contacted by phone by someone offering her braces, but "LR" informed them that they did not need or want the medical equipment. SMS shipped "LR" several pieces of DME purportedly ordered by Dr. Martin Perlin and billed Medicare $1,800.00 for the DME provided to beneficiary "LR."

69.    Between the 168 Medicare fraud hotline complaints involving SMS and the subsequent beneficiary reviews, the United States has been unable to identify any beneficiary for whom SMS billed Medicare who had a legitimate physician-patient relationship with the ordering physician or who needed the medical devices that SMS provided.

### *Fraudulent Conduct of EMS*

70.    Since its enrollment in Medicare on October 31, 2024, EMS has carried on the same scheme of employing deceptive and manipulative tactics to obtain Medicare beneficiary

information and bill Medicare for unnecessary DME.

71.    In particular, evidence developed by federal investigators demonstrates that EMS illegally purchased Medicare beneficiary information, including BINs from third party marketers as a way to develop "raw leads" and bill Medicare for unnecessary DME.

72.    On December 1, 2024, EMS entered into a "marketing agreement" with a company called "Ring Line."   Pursuant to the contract, EMS paid Ring Line to produce spreadsheets containing beneficiary data including name, address, date of birth, gender, medications, medical conditions, brace type, and BIN.

73.    This data was used by EMS to bill Medicare and obtain at least $37,186.04 in payments from Medicare.

74.    EMS also engaged in a scheme to obtain orders for DME from patients' doctors by faxing the doctors' offices "preauthorization forms" that appear to be standard forms required by insurance companies to authorize payment for items ordered by physicians.   In fact, some doctors interviewed by federal investigators admitted that they mistakenly signed the orders not realizing they did not relate to treatment actually ordered by the physician. Other physicians interviewed confirmed that they did not sign the EMS prescription forms at all and did not have any record of the patient in question though the doctor is identified as the referring provider.

### Spadaro's Financial Control and Overseas Transfers

75.    As a result of the scheme described above, Spadaro and the Spadaro Entities billed Medicare a total of $31,445,157.01 and were paid a total of $13,079,189.16.

76.    Each of the Spadaro Entities submitted an Electronic Funds Transfer Authorization Agreement ("EFT Agreement") to Medicare as part of their enrollment in Medicare.   On each of the EFT Agreements George Spadaro was identified as the company president, and his signature

appeared under "Authorized/Delegated Official Signature." Each of the EFT Agreements authorized Medicare to deposit claim payments into bank accounts controlled by Spadaro at City National Bank.

77.     At relevant times, Spadaro had conversations with representatives of City National Bank about the possibility of setting up bank accounts in foreign countries including the United Arab Emirates and Italy, which City National Bank declined to do. City National Bank representatives confirmed that funds deposited into the Spadaro Entities' accounts with City National Bank have been transferred out of the accounts using PayPal and Mercury Fintech, a financial company frequently used to transfer funds to overseas bank accounts.

78.     City National Bank representatives are aware that Spadaro resides in the Philippines and appears to have transferred the majority of the Medicare payments deposited into the City National Bank accounts to accounts in the Philippines or other locations overseas.

79.     An action for civil forfeiture of approximately $2,004,184.65 relating to the above allegations and held by City National Bank is currently pending before the United States District Court for the Southern District of West Virginia (No. 2:24-cv-00685).

80.     In addition, pursuant to the Federal Debt Collection Procedures Act ("FDCPA"), 28 U.S.C. §§ 3001-3308, the United States is entitled to a writ of attachment or garnishment to prevent dissipation of these funds because the United States has shown (1) reasonable cause to believe that Spadaro has left the jurisdiction of the United States and is likely to transfer subject funds outside the jurisdiction of the United States with the effect of hindering, delaying, or defrauding the United States in its effort to recover a debt; and (2) the debtor resides outside the jurisdiction of the United States. 28 U.S.C. §§ 3201, 3102 ("[A] court shall issue a writ authorizing the United States to attach property in which the debtor has a substantial nonexempt

interest, as security for such judgment (and interest and costs) as the United States may recover on a claim for a debt." 28 U.S.C. § 3102(b)). The United States anticipates that it will file an action for attachment pursuant to the FDCPA to prevent dissipation of the Defendants' assets.

### FIRST CAUSE OF ACTION
**False Claims Act: Causing Presentment of False Claims – Medicare
(31 U.S.C. § 3729(a)(1)(A))**

81.     The United States repeats and re-alleges the above paragraphs as if fully set forth herein.

82.     As more fully detailed in the above paragraphs, during the relevant periods, the Defendants knowingly presented or caused false claims to be presented for payment and approval to the United States for DME that was not reasonable and necessary for the Medicare beneficiaries to whom they were prescribed.

83.     As more fully detailed in the above paragraphs, during the relevant periods, the Defendants knowingly submitted false claims for payment and approval to the United States that were tainted by violations of the Anti-Kickback Act in that the Defendants made monetary payments in return for fraudulent DME prescriptions.

84.     Defendants' conduct—obtaining prescriptions and orders for DME that was not medically necessary—was and is material to Medicare's payment decisions. Medicare would not have paid claims for these DME prescriptions and orders if it had been aware of Defendants' conduct.

85.     The fact that prescriptions and orders procured by the Defendants were tainted by kickbacks, in the form of monetary payments for prescriptions, was and is material to the payment decisions made by Medicare. The United States, through Medicare, would not have paid claims for the subject DME prescriptions if it had known they were tainted by kickbacks.

86.    By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial.

87.    By virtue of the false or fraudulent claims that Defendants made or caused to be made, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, in an amount to be determined at trial, plus civil penalties in the amount provided by law. *See* 28 C.F.R. § 85.5.

### SECOND CAUSE OF ACTION
**False Claims Act: False Statements to Get a Claim Paid**
**(31 U.S.C. § 3729(a)(1)(B))**

88.    The United States repeats and re-alleges the above paragraphs as if fully set forth herein.

89.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, a false record or statement material to a false or fraudulent Medicare claim in violation of the False Claims Act, as amended, in that the DME supplied by the Defendants did not qualify for reimbursement under Medicare.

90.    Defendants' conduct—obtaining prescriptions and orders for DME that was not medically necessary—was and is material to Medicare's payment decisions. Medicare would not have paid claims for these DME prescriptions and orders if it had been aware of Defendants' conduct.

91.    By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial.

92.    By virtue of the false or fraudulent statements that Defendants made or caused to be made, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, in an amount to be determined at trial, plus civil penalties in the amount provided

by law. *See* 28 C.F.R. § 85.5.

### THIRD CAUSE OF ACTION
**False Claims Act violations arising from violation of the Anti-Kickback Statute**
**(42 U.S.C. § 1320a-7b(b)(4))**

93.     Title 42, U.S.C. § 1320a-7b(b)(4) provides that "[w]hoever without lawful authority knowingly and willfully purchases, sells or distributes, or arranges for the purchase, sale, or distribution of a beneficiary identification number or unique health identifier for a health care provider under subchapter XVIII, subchapter XIX, or subchapter XXI shall be imprisoned for not more than 10 years or fined not more than $500,000 ($1,000,000 in the case of a corporation), or both."

94.     By purchasing Medicare beneficiary information including Medicare BINs and/or unique health identifiers from third party marketing companies, the Defendants violated 42 U.S.C. § 1320a-7b(b)(4).

95.     As codified in the Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-148, § 6402(f), 124 Stat. 119 (codified at 42 U.S.C. § 1320a-7b(g)), "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]." Accordingly, a person or entity violates the False Claims Act when they knowingly submit or cause to be submitted claims to federal healthcare programs that result from violations of the Anti-Kickback Statute.

96.     By virtue of the false or fraudulent statements that Defendants made or caused to be made, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, in an amount to be determined at trial, plus civil penalties in the amount provided by law. *See* 28 C.F.R. § 85.5.

## FOURTH CAUSE OF ACTION
### Common Law Fraud

97.    The United States repeats and re-alleges the above paragraphs as if fully set forth herein.

98.    This is a claim against the Defendants under common law fraud.

99.    The above described false claims and false statements, which the Defendants knowingly presented or caused to be presented to Medicare, or knowingly made or caused to be made or used in support of a claim to Medicare, are (1) false representations or concealments of material facts, (2) reasonably calculated to deceive Medicare, (3) made with intent to deceive Medicare, (4) which did in fact deceive Medicare, and (5) resulted in damage to Medicare.

100.    Based on their executed Provider Agreements, Medicare reasonably relied on the Defendants' certification that they would file appropriate, non-deceptive, claims for reimbursement.

101.    As a result of the false claims, Medicare reimbursed for products that were billed in violation of Medicare policy, which Medicare would not have paid had the Defendants not filed false and deceptive claims.

102.    The United States, acting on the accuracy and truthfulness of the information contained in the claims submitted, paid certain sums of money to which relevant billing providers were not entitled, and the Defendants are thus liable to account for and pay such amounts, which are to be determined at trial, to the United States.

## FIFTH CAUSE OF ACTION
### Payment under Mistake of Fact/Restitution

103.    The United States repeats and re-alleges the above paragraphs as if fully set forth herein.

104.    This is a claim against Defendants under common law mistake of fact.

105.    The above-described false claims and false statements, which the Defendants submitted or caused to be submitted to the United States, constituted misrepresentations of material fact in that Defendants misrepresented the products they provided to Medicare beneficiaries.

106.    The United States, acting on the accuracy and truthfulness of the information contained in the claims submitted, paid certain sums of money to which the relevant billing providers were not entitled, and the Defendants are thus liable to account for and pay such amounts, which are to be determined at trial, to the United States.

## SIXTH CAUSE OF ACTION
### Unjust Enrichment/Restitution

107.    The United States repeats and re-alleges the above paragraphs as if fully set forth herein.

108.    This is a common law claim for recovery of monies by which the Defendants have been unjustly enriched.

109.    By virtue of the false claims and false statements described above, the Defendants wrongfully obtained Medicare funds to which they were not entitled.

110.    By directly or indirectly obtaining Medicare funds to which they were not entitled, the Defendants were unjustly enriched at the expense of the United States, and are liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment in favor of the United States and against the Defendants as follows:

1.     On the First, Second, and Third Causes of Action, under the False Claims Act, a judgment against the Defendants for the amount of damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper;

2.     On the Fourth Cause of Action, for common law fraud, a judgment against the Defendants in an amount to be determined, together with costs and interest;

3.     On the Fifth and Sixth Causes of Action, a judgment against the Defendants for payment by mistake of fact and unjust enrichment, for the damages sustained and/or amount which the Defendants received which were in error or by which the Defendants were unjustly enriched, together with costs and interest; and

4.     For such other and further relief as this Court deems just and proper.

## DEMAND FOR A JURY TRIAL

The Plaintiff demands a jury trial in this case.

Respectfully submitted,

**LISA G. JOHNSTON**
**Acting United States Attorney**


<u>**s/Gregory P. Neil**</u>
WV State Bar No. 11077
Assistant United States Attorney
Attorney for United States
300 Virginia Street East
Room 4000
Charleston, WV   25301
Phone: 304-345-2200
Fax: 304-347-5443
E-mail: greg.neil@usdoj.gov
Counsel for Plaintiff United States of America