**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**BECKLEY DIVISION**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**CIVIL ACTION NO. 5:25-cv-00585**

**v.**

**GEORGE SPADARO,**
**LOCUST MEDICAL, LLC,**
**SUMMERS MEDICAL SUPPLY, LLC, and**
**EASTERN MEDICAL SUPPLY, LLC**

**Defendants.**

## APPLICATION FOR PREJUDMENT REMEDIES
## PURSUANT TO THE FEDERAL DEBT COLLECTION PROCEDURES ACT

In this application, the government seeks prejudgment remedies under the Federal Debt Collect Procedures Act, 28 U.S.C. § 3001 *et seq*., against Defendants George Spadaro, Locust Medical ("LM"), Summers Medical Supply, LLC ("SMS"), and Eastern Medical Supply, LLC ("EMS") (Collectively the "Spadaro Entities"). As outlined in the government's Complaint in this matter (ECF No. 1), Spadaro and the Spadaro Entities, obtained millions of dollars from Medicare to which they were not entitled, in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq*. As relevant here, Spadaro caused the Spadaro Entities to submit at least 17,645 false claims for durable medical equipment (DME) resulting in improper payments of at least $8,647,349.34. The United States seeks treble damages and civil penalties under the False Claims Act to hold Spadaro and the Spadaro Entities accountable for their false claims to Medicare. Spadaro and the Spadaro Entities, however, have engaged in financial transactions that have had the effect of hindering the government's ability to recover on its claims. The government thus applies for prejudgment remedies pursuant to the Federal Debt Collection Procedures Act, namely writs of attachment, or

in the alternative writs of receivership,[1] on bank accounts maintained at City National Bank, including approximately $2,004,184.65 previously seized from one of those accounts by the U.S. Marshals.

## Standard for Prejudgment Remedies

### A. The Federal Debt Collection Procedures Act

The Federal Debt Collection Procedures Act (FDCPA) provides the exclusive civil procedures for the United States "to recover a judgment on a debt[,]" 28 U.S.C. § 3001(a)(1), and "to obtain, before judgment on a claim for a debt, a remedy in connection with such claim." 28 U.S.C. § 3001(a)(2). The FDCPA authorizes district courts to secure a debtor's property through several different means, see 28 U.S.C. § 3101, including attachment, 28 U.S.C. § 3102, garnishment, 28 U.S.C. § 3104, or sequestration, 28 U.S.C. § 3105, of real or personal property. The purpose of these prejudgment remedies is to establish "security to satisfy such judgment, and interest and costs, as the United States may recover on such claim" for a debt. 28 U.S.C. §§ 3102(b), 3105(a).

The government seeks a writ of attachment under Subchapter B against funds currently held by the U.S. Marshals Service pursuant to a civil forfeiture action previously filed in this Court (*U.S. v. Approximately 2,004,184.65 in United States Currency from City National Bank Account Ending in 4556*, No. 2:24-cv-00685) and any funds found remaining in any other bank account found in the name of any of the defendants up to the amount of the debt described herein. The government is entitled to such writs where it establishes: (1) the probable validity of the claim for a debt; (2) the amount of the debt claimed; (3) that there is reasonable cause to believe that the debtor is about to leave the jurisdiction of the United States with the effect of hindering, delaying,

---

[1] Should the Court deem it appropriate, the United States would not object to the funds in question being transferred to a receiver pursuant to 28 U.S.C. § 3103.

or defrauding the United States in its effort to recover a debt or is about to dispose, remove, or conceal property with the effect of hindering, delaying, or defrauding the United States; (4) that it has satisfied all other statutory requirements; and (5) that the debtor has a substantial nonexempt interest in the property against which a remedy is sought. 28 U.S.C. § 3101.

To establish its entitlement to prejudgment remedies, the FDCPA requires that the government provide affidavits establishing with particularity facts supporting the probable validity of its claim for the debt and its right to the relief sought in the application. 28 U.S.C. § 3101(c). Here, the government provides the declarations of Special Agent Adam Powers, Office of Inspector General, Health and Human Services, attached hereto as Exhibit A. The Court should consider the "totality of the circumstances" when evaluating whether the government established the probable validity of its claims. *United States ex rel. Doe v. DeGregorio*, 510 F. Supp. 2d 877, 885 (M.D. Fla. 2007). "Establishing the 'probable validity' of a claim of debt 'does not require proof rising to the level of that required at trial but rather requires only that the Government meet the probable cause standard.'" *United States v. LabQ Clinical Diagnostics, LLC*, 771 F. Supp. 3d 401, 431 (S.D.N.Y. 2025), *citing Cent. Med. Sys.*, 2018 WL 5112911, at *4 and *CFPB v. Carnes*, 2023 WL 7407576, at *13 (D. Kan. Nov. 9, 2023) ("[T]he probable validity requirement is akin to probable cause.")." As in other contexts based on probable cause, the court is not limited to considering only evidence that would be admissible at trial but may consider hearsay or other evidence not admissible at trial. *LabQ,* 771 F. Supp. 3d at 431. In short, "at this stage, the threshold is not high." *Id.* at 466.

Finally, because of the speed with which the defendant may dispose of property, the Court may issue prejudgment relief on the basis of the government's application without waiting for a response from the debtor. The Court may issue the prejudgment relief requested first, without

waiting for a response from the debtor, so long as the United States has made its required showing. *NLRB v. E.D.P. Med. Comp. Sys., Inc.*, 6 F.3d 951, 955-56 (2d Cir. 1993).[2] If the Court grants the requested writs, the Defendants are thereafter entitled to request a hearing. 28 U.S.C. § 3101(d). The writs must be accompanied by a notice of prejudgment remedies signed by the Clerk of Court. 28 U.S.C. § 3101(d). The notices inform the debtors that they are entitled to a hearing within five days after the Clerk of Court receives the request, if the debtors wish that the hearing take place that quickly. Id. The United States is further entitled to pre-judgment discovery into a debtor's financial condition where the debt will likely exceed $50,000. 28 U.S.C. § 3015.

The United States has brought this action under the False Claims Act, 31 U.S.C. § 3729 *et seq.* Amounts claimed as owing to the United States under the FCA are considered a "debt" that is subject to the FDCPA. The FDCPA defines a "debt" to the United States as, among other things, an amount owing to the United States on the account of a "fine, assessment, penalty, restitution, damages," or "any other source of indebtedness." 28 U.S.C. § 3002(3)(B). Courts have previously held that claims under the FCA, and associated common law claims, constitute a "debt" for purposes of the FDCPA, and have granted prejudgment remedies in such cases. *United States v. Berkeley Heartlab, Inc.*, 225 F. Supp. 3d 460, 466 (D.S.C. 2016) ("courts have held that 'a party that violates the FCA incurs a debt to the government as soon as the government pays the fraudulent claim. Thus by alleging that the defendants submitted false claims and made false statements under the FCA, the government sufficiently alleges the existence of a debt under the FDCPA'") (quoting *United States v. First Choice Armor & Equip.*, 808 F. Supp. 2d 68, 79 (D.D.C. 2011) ("[B]y alleging that the defendants submitted false claims and made false statements under

---

[2] The Court may act on the Application before the debtor has been served, but the debtor has an opportunity to request a hearing on already-issued writs following service. § 3101(d).

the FCA, the government sufficiently alleges the existence of a debt under the FDCPA.")); *United States ex rel. Doe v. DeGregorio*, 510 F. Supp. 2d 877, 884 (M.D. Fla. 2007) ("Treble damages under the False Claims Act . . . constitutes 'debt'" under the FDCPA).

**B. The False Claims Act**

The United States' Complaint asserts three counts under the False Claims Act. The False Claims Act (FCA), 31 U.S.C. § 3729(a)(1)(A), provides that a person is liable to the United States Government for three times the amount of damages which the Government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." Count I of the Government's Complaint alleges claims under 31 U.S.C. § 3729(a)(1)(A).3 (ECF No. 1).

The FCA, 31 U.S.C. § 3729(a)(1)(B), also provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Count II of the Government's Complaint alleges claims under 31 U.S.C. § 3729(a)(1)(B) of the FCA. (EFC 1).

The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(4) provides that "[w]hoever without lawful authority knowingly and willfully purchases, sells or distributes, or arranges for the purchase, sale, or distribution of a beneficiary identification number or unique health identifier for a health care provider under subchapter XVIII, subchapter XIX, or subchapter XXI shall be imprisoned for not more than 10 years or fined not more than $500,000 ($1,000,000 in the case of a corporation), or both." 42 U.S.C. § 1320a-7b(g)) states that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for

purposes of [the False Claims Act].” Accordingly, the United States is entitled to recovery three times the amount of damages that the Government sustained, plus a civil penalty, for each violation of 42 U.S.C. § 1320a-7b(b)(4). Count III of the Government’s Complaint alleges claims under 42 U.S.C. § 1320a-7b(b)(4). (EFC 1).

**C. Federal Common Law Claims**

The United States Complaint also asserted federal common law claims for common law fraud, payment under mistake of fact/restation, and unjust enrichment against all defendants (Counts IV, V, and VI).

## ARGUMENT

**A. Prejudgment relief is warranted because the United States has established the probable validity of its claim of a debt in the amount of at least $8,647,349.34.**

The United States’ Complaint sets forth facts with particularity demonstrating the validity of the United States’ entitlement to single damages of at least $8,647,349.34, treble damages of at least $25,942,048.02, and civil penalties of at least $252,464,660, subject to the court’s discretion and approval. As set forth in the Affidavit of HHS-OIG Special Agent Adam Powers, beginning in early 2020 Spadaro formed and operated LM, SMS, and EMS to bill Medicare for durable medical equipment (DME) provided to Medicare beneficiaries in the United States targeted through international telemarketing efforts. Ex. A, Declaration of S.A. Adam Powers at ¶ 6. Since then, LM, SMS, and EMS have received payments from Medicare of at least $8,647,349.34 for DME ordered without a face-to-face encounter with a physician where Medicare regulations required it. Id. at ¶ 20.

Prior to opening LM, SMS, and EMS, Spadaro was well-versed in the international telemarketing industry. Since at least 2003 Spadaro has owned and operated a company called USA Outsource Today offering telemarketing services from call centers located in the Philippines.

Id. at ¶ 7. Spadaro was also identified by Dr. Govind Seth as a representative of Murdock Consulting, a company engaged in recruiting and paying illegal kickbacks to physicians to participate in Medicare telemarketing schemes. Id. at ¶ 8. The owner of Murdock Consulting, Peter Efthimiou a/k/a "Steve Murdock" pled guilty in November 2019 to a federal criminal conspiracy charge arising from his participation in a Medicare telehealth scheme resulting in fraudulent Medicare claims totaling more than $122 million. Id. at ¶ 9. The criminal information in that case described Efthimiou as participating in an "international fraud and kickback scheme targeted at the Medicare program" carried out partially by known and unknown actors overseas. *United States v. Peter Efthimiou A/K/A Steve Murdock*, S.D.Ga. No. 4:19-cr-00156.[3] Spadaro's association with Murdock Consulting demonstrates that he was intimately familiar with the international telemarketing scheme targeting Medicare beneficiaries before he ever opened the Spadaro Entities. In fact, within months of Efthimiou's guilty plea, Spadaro continued to follow the same roadmap established at Murdock Consulting targeting Medicare, even using some of the same physicians retained by Murdock to do so. Ex. A at ¶ 10, 11.

Dr. Govind Seth was one of those doctors. Dr. Seth, who went on to issue thousands of prescriptions for DME on behalf of LM and SMS, was first engaged by Spadaro as a representative of Murdock Consulting. Id. at ¶ 11. Dr. Seth reported that payments he had been receiving from Murdock Consulting stopped suddenly and he then began receiving checks from various insurance companies with which he was not enrolled. When he asked Spadaro about these checks, Spadaro told him the way they were billing had changed. Id. Even if the specific method of paying kickbacks for prescriptions had changed, Spadaro's submission of insurance claims on Dr. Seth's behalf to insurers with whom he was not enrolled followed the same playbook of providing illegal

[3] Because this is an ongoing investigation, the United States intends to interview Efthimiou in the near future regarding his dealings with Spadaro at Murdock Consulting.

remuneration to induce prescriptions payable by Medicare.

After forming LM and enrolling it in Medicare, George Spadaro engaged Dr. Seth to issue prescriptions on behalf of LM. Id. at ¶ 11. Spadaro told Dr. Seth that he could prescribe braces based on review of each patient's medical chart provided by Spadaro and that he did not meet with or conduct telehealth encounters with the patients. Id. Dr. Seth reported receiving calls from patients or patient's family members stating that the patient did not need the DME. Dr. Seth referred these calls to Spadaro. Id.

George Spadaro also engaged Dr. Oluremi Ilupeju to issue DME prescriptions on behalf of LM and SMS. Id. at ¶ 13, 14. Like Dr. Seth, Dr. Ilupeju did not see or conduct telehealth encounters with patients before issuing DME prescriptions. Id. Dr. Ilupeju received pre-filled patient intake forms from an email address identified with George Spadaro including patient information and Medicare beneficiary identification numbers (BINs). Id.

George Spadaro also engaged Dr. Martin Perlin to issue DME prescriptions on behalf of LM and SMS. Review of Dr. Perlin's billing data associated with patients of LM and SMS reveals that he did not have in person or face-to-face encounters prior to issuing DME prescriptions on behalf of LM and SMS. Id. at 15. Dr. Perlin was arrested on July 31, 2025 on federal health care fraud conspiracy charges involving ordering COVID-19 tests for Medicare beneficiaries with whom he had no physician-patient relationship. Id. Although these charges are not directly related to the case at bar, the government anticipates that Dr. Perlin will confirm that he did not have face-to-face encounters with patients presented to him by Spadaro as reflected by his billing data.

Medicare regulations required that certain types of DME be issued only after a face-to-face encounter with the ordering physician. Specifically, 42 C.F.R. § 410.38(d)(2) provides that "Items Requiring a Face-to-Face Encounter. For [power mobility devices] and other [DME, prosthetics,

orthotics, and supplies ("DMEPOS")] items selected for inclusion on the Required Face-to–Face Encounter and Written Order Prior to Delivery List, the treating practitioner must document **and communicate to the DMEPOS supplier** that the treating practitioner has had a face-to-face encounter with the beneficiary within the 6 months preceding the date of the written order/prescription." Neither Dr. Seth, Dr. Ilupeju nor Dr. Perlin conducted face-to-face encounters with patients before ordering DME on behalf of LM, SMS, and EMS. Ex. A at ¶ 45.

Spadaro expressly certified that he was aware of Medicare program requirements. Id. at ¶ 22. Claims for payment to Medicare must be made on a prescribed form (CMS Form 1500) or its electronic equivalent. The CMS Form 1500 contains certain express certifications applicable to each claim, including "I certify that: 1) the information on this form is true, accurate, and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complied with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute…" Id. at ¶ 22. By submitting or causing to be submitted claims for payment to Medicare for the DME described herein, Spadaro and the Spadaro Entities falsely certified that the claims were compliant with the law. Pursuant to his express certifications, Spadaro was aware of the face-to-face encounter requirements applicable to the DME for which his businesses billed Medicare. Spadaro was also fully aware that face-to-face encounters were not conducted because patient complaints regarding unwanted DME were referred directly to him. Id. at ¶ 21. He nonetheless continued to operate his businesses in such a way to foist unwanted and unneeded DME on Medicare

beneficiaries in order to defraud the Medicare system.

**B. There is Reasonable Cause to Believe Spadaro and the Spadaro Entities Are Likely to Transfer Funds Beyond the Jurisdiction of the Court without the Requested Relief.**

The United States is entitled to prejudgment remedies in this case because (1) there is "reasonable cause to believe that" the debtors are "about to leave the jurisdiction of the United States with the effect of hindering, delaying, or defrauding the United States in its effort to recover a debt" or that they "ha[ve] or [are] about to assign, dispose, remove, conceal, ill-treat, waste, or destroy property with the effect of hindering, delaying, or defrauding the United States." 28 U.S.C. § 3101(b)(1)(B).

Despite Medicare paying the Spadaro Entities over $13 million, the United States has been unable to find any assets owned by the Defendants in the United States other than amounts held in bank accounts at CNB. Approximately $2,004,184.65 that was held in a CNB account in the name of SMS was previously seized by the U.S. Marshal Service. Ex A at ¶ 32-33. LM's City National Bank account now holds approximately $1,245.96, SMS's CNB account holds only $228.93, and EMS's account holds approximately $4,621.20. Id. at ¶ 34. The United States has found no other real property, personal bank accounts, investments, or other real or personal property in the name of Spadaro or any of his businesses within the jurisdictional reach of this Court. Id. at ¶ 35.

The United States has good reason to fear the dissipation of the only assets within its reach, which now equal far less than the minimum amount of the debt owed. Investigators spoke with representatives of City National Bank (CNB) regarding the accounts in question. CNB representatives reported that Spadaro opened the accounts and had discussions with CNB regarding his businesses. Ex. A at ¶ 24. Spadaro told CNB that he had a wife in the Philippines and was essentially living there and that he would be traveling to Thailand, Egypt, the UAE and Italy. Id. at ¶ 26. Spadaro sought to open CNB accounts overseas in the UAE and Italy to support

what he described as an international medical company and requested the ability to initiate international wire transfers from the CNB accounts. Id. at ¶ 25. CNB representatives found Spadaro's business dealings to be suspicious and watched his accounts closely. Id. at ¶ 28. CNB confirmed that Spadaro made frequent transfers out of the accounts using financial applications including Wise, Remitly, Paypal, and Mercury Fintec, all of which CNB recognized to be frequently used for international financial transfers. Id. at ¶ 29. Based on the patters of large transfers from the accounts, CNB representatives believed that funds deposited into the accounts would quickly be transferred overseas. Id. at ¶ 31.

Indeed, there is ample evidence that Spadaro now lives, works, and operates his businesses entirely from the Philippines. Border crossing data reviewed by investigators reveals that Spadaro has only been in the United States for 94 days since July 7, 2019, or approximately four percent of the time. Id. at ¶ 36. Spadaro has had no inbound border crossings since he left the United States on September 6, 2022. Id. at 37.

Spadaro publicly accessible social media activity (where he identifies himself as "Jorge Espadaro") confirms that he is actively living and operating his businesses from the Philippines. Id. at ¶ 38. Facebook posts and comments reviewed by investigators confirm that Spadaro is romantically linked with a Filippino woman name Sakuragi Jen, who goes by "Jen." Id. at ¶ 39. Spadaro appears to own and operate a nightclub in Cebu City, Philippines along with Jen. Id. at ¶ 40-42. Spadaro and Jen also appear to operate a telemarketing business from their Philippines residence under the name G&J Medical IT Solutions. Id. at ¶ 42. Spadaro has also made job postings in the Philippines for "G&J Construction." Id.

The first criteria for prejudgment remedies under 28 U.S.C.A. § 3101(b)(1) is that "the debtor…(A) is about to leave the jurisdiction of the United States with the effect of hindering,

delaying, or defrauding the United States in its effort to recover a debt." Similarly, 28 U.S.C. § 3102 entitles the United States to a writ of attachment "(3) if the debtor resides outside the jurisdiction of the United States." 28 U.S.C. § 3102(b)(3).

Importantly, the United States must only demonstrate that the Defendants' actions have had the *effect* of, *inter alia*, "dispo[sing]" of assets that would hinder the ability of the United States to recover, and *not* that the Defendants' intended to hinder the United States. *United States v. Teeven*, 862 F. Supp. 1200, 1214 n.12 (D. Del. 1992) (FDCPA "does not require the Government to show that a debtor's actions are fraudulent or secretive. Rather, the Government must provide the Court with a reasonable cause to believe the Defendants have or are about to take actions with regard to their properties that would have 'the effect of hindering, delaying or defrauding the United States.' 28 U.S.C. § 3101(b)). "The statute contains no 'intent' requirement." *United States v. Teeven*, No. CIV. A. 92–418 LON, 1992 WL 683683, at *7 (D. Del. Aug. 14, 1992). Even an innocuous explanation for the transactions is not a defense as the United States need only show that it would hinder or delay the Government's ability to collect. *United States v. Berkeley Heartlab, Inc.*, 225 F. Supp. 3d 460, 470 (D.S.C. 2016).

Because Spadaro currently lives and operates his businesses exclusively from the Philippines, he has the means to transfer funds overseas, and he has a demonstrated record of transferring funds overseas, there is reasonable cause to believe that he will transfer any funds in his control beyond the jurisdiction of this Court. Accordingly, the United States is entitled to a writ of attachment pursuant to 28 U.S.C. 3102.

**C. The amount of the debt owing to the United States**

Medicare billing data for the Spadaro Entities identifies the physician who ordered the DME associated with each claim along with the specific DME ordered. By identifying only the

DME items that appeared on the mandatory face-to-face encounter list ordered by Dr. Seth, Dr. Ilupeju, or Dr. Perlin, none of whom conducted face-to-face encounters with the patients, investigators identified 17,645 false claims resulting in Medicare payments of $8,647,349.34. Ex. A at ¶ 46. Pursuant to the False Claims Act, the United States is entitled to treble damages of $25,942,048.02 resulting from this conduct as well as civil penalties assessed for each false claim. The United States is seeking writs of attachment, with the amount of security not to exceed $8,647,349.34, which is the amount of single damages sought in the FCA matter. The Court can consider treble damages and penalties under the FDCPA context, but the United States is not so seeking at this juncture. Accordingly, the United States' is limiting its claim for purposes of prejudgment remedies to only the necessary amount for security, rather than requesting the full amount that the United States may ultimately seek through this litigation.

**D. Prejudgment remedies sought**

The United States seeks the prejudgment remedies of writs of attachment to funds already seized and any bank accounts that may be found within the jurisdiction of the Court in the names of any of the Defendants.

**1. Writs of Attachment**

The United States may seek a writ of attachment against "[a]ny property in the possession, custody, or control of the debtor and in which the debtor has a substantial nonexempt interest . . ." 28 U.S.C. § 3102(a)(1). Attachment is available as security for amounts owing based on a penalty and for damages sounding in tort. *Id.* § 3102(b)(2), (4). 28 U.S.C.A. § 3102(d)(4) provides for levy against personal property by the United States Marshal by "taking possession of it." Because the United States Marshal has previously seized funds pursuant to the civil forfeiture action filed by the United States, issuance of the requested writ would simply substitute the authority by which

the U.S. Marshal holds those funds.

**2. Financial Discovery**

Finally, the United States also requests that it be permitted to conduct financial discovery as part of this application and in conjunction with this civil action to discover any assets that Defendants may have. Financial discovery is specifically permitted by 28 U.S.C. § 3015.

**CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court authorize the prejudgment writs of attachment and authorize discovery of the debtors' financial condition. The Government will submit proposed writs, orders, orders for the clerk of court, and proposed notices should the Court so request.

Respectfully submitted,

**MOORE CAPITO**
**United States Attorney**

**s/Gregory P. Neil**
WV State Bar No. 11077
Assistant United States Attorney
Attorney for United States
300 Virginia Street East
Room 4000
Charleston, WV 25301
Phone: 304-345-2200
Fax: 304-347-5443
E-mail: greg.neil@usdoj.gov
Counsel for Plaintiff United States of America