**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**BECKLEY DIVISION**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**CIVIL ACTION NO. 5:25-cv-00585**

**v.**

**GEORGE SPADARO,**
**LOCUST MEDICAL, LLC,**
**SUMMERS MEDICAL SUPPLY, LLC, and**
**EASTERN MEDICAL SUPPLY, LLC**

**Defendants.**

## DECLARATION OF S.A. ADAM POWERS

I, Adam Powers, declare and state as follows:

1. I am a Special Agent with the United States Department of Health and Human Services – Office of Inspector General (hereafter "HHS-OIG"). I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516. I am empowered to investigate crimes, to make arrests with or without warrants, and to execute search warrants under the authority of 21 U.S.C. § 878.

2. I am currently assigned to the Roanoke, Virginia Field Office of HHS-OIG and have been employed as a Special Agent of HHS-OIG since 2023. Prior to my position as a Special Agent, I was employed as a State Trooper by the North Carolina State Highway Patrol for approximately 3 years.

3. In my capacity as an HHS-OIG Special Agent, I have completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center. Additionally, I

have received specialized training and have experience in the investigation of federal health care offenses.

4. As an HHS-OIG Special Agent, I have had experience in interviewing witnesses/targets, directing cooperating individuals, and interacting with other persons who have personal knowledge and experience regarding federal health care offenses.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient cause for the requested application and does not set forth all of my knowledge about this matter.

## *SPADARO CONDUCT*

6. Beginning in or around April, 2020 George Spadaro ("Spadaro") formed and operated a series of business entities including Locust Medical, LLC ("LM"), Summers Medical Supply, LLC ("SMS"), and Eastern Medical Supply, LLC ("EMS")(collectively the "Spadaro Entities") and enrolled them in the Medicare program in order to submit claims and receive payments from Medicare primarily for durable medical equipment ("DME") purportedly provided to Medicare beneficiaries through telemarketing efforts.

7. According to Spadaro's public facing profile published on the professional social media networking platform Linked-In, he has been involved in the international outsourcing industry since at least 2003 as an "entrepreneur/senior project manager" for USA Outsource Today, a company that operated call centers in the Philippines. One witness identified Spadaro as the owner of USA Outsource Today. On May 9, 2025, Spadaro promoted USA Outsource Today on a Facebook group titled "BPO Campaigns for Center Owners in Philippines." Based on open source research, Spadaro also appears to be associated with other businesses in the Philippines including

G&J Medical IT Solutions, a company located in Cebu City, Philippines, connected to Spadaro's Philippines residence.

8. Prior to opening LM, SMS, and EMS, Spadaro was a known representative of Murdock Consulting, Inc., a company owned and operated by Peter Efthimiou a/k/a "Steve Murdock." In his capacity as a representative of Murdock Consulting, George Spadaro established relationships with physicians who were retained to approve orders and/or prescriptions for durable medical equipment provided to Medicare beneficiaries as part of a nationwide telemedicine scheme. Spadaro arranged for payment to be made to these physicians in return for providing the requested prescriptions.

9. On September 24, 2019 Peter Efthimiou a/k/a "Steve Murdock" was charged by information in the United States District Court for the Southern District of Georgia as part of a conspiracy to "engage in an international fraud and kickback scheme targeted at the Medicare program that led to over $122 million in fraudulent claims being submitted for genetic testing, durable medical equipment, and pain creams." The information described Efthimiou as playing a part in a sweeping health care fraud conspiracy primarily carried out by other co-conspirators overseas.

10. Soon after Efthimiou was charged, George Spadaro formed Locust Medical, LLC on April 8, 2020, enrolled it in the Medicare program, and continued a telemarketing scheme nearly identical to that described in Efthimiou's Indictment.

11. Specifically, Dr. Govind Seth was interviewed as part of the federal investigation. Dr. Seth was identified as the referring provider on thousands of claims for DME submitted by Locust Medical. Dr. Seth reported to investigators that he was first recruited by Murdock Consulting, the company owned by "Steve Murdock," to prescribe braces. Dr. Seth identified

George Spadaro as a point of contact for Murdock Consulting. At some point George Spadaro told Dr. Seth that he as now a representative of LM, and Dr. Seth began prescribing on behalf of LM. Spadaro told Seth that that he could prescribe braces to patients based on review of the patient's medical chart, and Dr. Seth did not meet with or conduct telehealth sessions with the patients. Seth reported that he was paid $20 to $30 for each prescription he issued. Dr. Seth also reported that he started getting checks in the mail from various insurance companies he was not enrolled with ranging from $10 to more than $100. When Dr. Seth asked Spadaro about the paper checks, Spadaro told him the way they were billing had changed.

12. Dr. Seth reported that he received calls from patients or a patient's family member who said the patient did not need or want the DME. Dr. Seth reported that he would forward these complaints to Spadaro.

13. George Spadaro established relationships with various other physicians on behalf of LM, SMS, and EMS including Dr. Oluremi Ilupeju and Dr. Martin Perlin.

14. Dr. Ilupeju was interviewed as part of the federal investigation. He reported that he did not see any of the patients in person or conduct a face-to-face appointment before prescribing DME. Dr. Ilupeju stated that he would receive phone calls throughout the day from representatives of the Spadaro Entities along with a purported patient. He would ask the patient's questions and issue the DME orders. Dr. Ilupeju reported that he received intake forms for each patient from an email account identified as belonging to George Spadaro, which had the patient's information filled out including Medicare BIN.

15. Dr. Martin Perlin was identified as the referring provider on 7,930 claims submitted to Medicare by LM, SMS, and EMS, totaling $9,909,529.82 between July 8, 2022, and July 17, 2025. Investigators have not yet been able to interview Dr. Perlin due to an ongoing investigation.

Dr. Perlin was arrested on July 31, 2025 in connection with a separate health care fraud conspiracy involving ordering medical test for Medicare beneficiaries with which Perlin had no physician patient relationship. Claims submitted to Medicare for encounters with patients on behalf of LM and SMS reveal that he only billed for telephone calls, not for in person or face-to-face encounters.

16. Between July 21, 2020, and June 4, 2024, the Centers for Medicare and Medicaid Services ("CMS") Benefit Integrity Unit received 385 fraud hotline complaints from Medicare beneficiaries, many of whom reported that they had received DME from LM that they did not need or order and that Medicare was fraudulently billed for DME without their consent. Between March 20, 2023, and August 9, 2024, the CMS BIU received 168 fraud hotline complaints from Medicare beneficiaries, many of whom reported that they had received unwanted DME from SMS under similar circumstances. Many of these beneficiaries complained that they had never heard of the DME company or the referring physician.

17. Numerous beneficiaries were interviewed by federal agents, and the beneficiaries denied that they had ever heard of the Spadaro entity involved or the ordering physician.

18. Spadaro and LM, SMS, and EMS obtained Medicare beneficiary information by employing marketers or marketing companies that used deceptive methods to obtain beneficiary information such as calling from numbers that appeared to be associated with Medicare, telling beneficiaries that they were in fact calling on behalf of Medicare, and convincing patients they needed information to order a new Medicare card. Spadaro and the Spadaro Entities purchased beneficiary information from various marketing companies including BINs in order to bill Medicare for DME.

19. EMS also reportedly engaged in a deceptive campaign of faxing forms marked as preauthorization forms directly to patient's own physicians to obtain their signatures, then

submitting claims to Medicare based on this information. Some of these physicians admitted to signing the forms because they mistook them for routine insurance forms, and others denied signing them at all.

20. Medicare billing data identifies the ordering physician and DME type associated with each claim. Based on their statements and review of their own provider billing data it is apparent that Dr. Seth, Dr. Ilupeju and Dr. Perlin did not conduct face-to-face encounters with any of the patients of LM, SMS, or EMS prior to issuing prescriptions. A total of 17,645 claims submitted by LM, SMS, and EMS were for DME items which required a face-to-face encounter and on which Dr. Seth, Dr. Ilupeju or Dr. Perlin were identified as the referring provider. These claims resulted in a payments by Medicare of approximately $8,647,349.34.

21. Spadaro was aware that physicians were not conducting required face-to-face encounters with beneficiaries because he was informed about patients and patient's family members calling the physician's offices to complaint when they received DME that was not needed or wanted.

22. Each claim for payment to Medicare must be made on a prescribed form (CMS Form 1500) or its electronic equivalent. The CMS Form 1500 contains certain express certifications applicable to each claim, including "I certify that: 1) the information on this form is true, accurate, and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complied with all applicable Medicare and/or Medicaid laws,

regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute…"

***International Financial Transactions***

23. As part of my investigation I had conversations with representatives of City National Bank ("CNB"), an institution where LM, SMS, and EMS maintained bank accounts and deposited Medicare payments.

24. CNB representatives reported that Spadaro personally opened the accounts in question and was a signatory on each along with his mother Barbara Aguilar.

25. Spadaro regularly communicated with CNB regarding his accounts including requesting to open accounts overseas in the United Arab Emirates and Italy to service an international medical company and the ability to initiate international wire transfers online.

26. Spadaro told CNB representatives that he was living part time between the United States and the Philippines and that he had a wife or significant other in the Philippines. Spadaro also mentioned that he would be traveling to Thailand, Egypt, the UAE and Italy.

27. Local CNB representatives in Hinton, WV had occasion to observe the storefront locations for the Spadaro Entities and they appeared to be largely empty.

28. CNB representatives have watched the accounts since Spadaro began opening them in 2020. CNB viewed Spadaro's accounts as suspicious because of Spadaro's international ties and because the storefronts for the businesses in Hinton, WV appeared to be largely empty despite frequent deposits being made in the accounts.

29. Representatives reported that Spadaro makes frequent large transfers out of the accounts using financial applications including Wise, Remitly, Paypal, and Mercury Fintec, all of which are frequently used to transfer money overseas.

30. Transactions in the accounts for international airfare and travel expenses corroborated Spadaro's overseas dealings.

31. Based on the established pattern of money being syphoned out of the accounts through apparent foreign transfers, CNB representatives believed that any money released to the accounts would be quickly swept overseas by Spadaro.

***Assets***

32. As part of my investigation, I have searched for assets in the United States that may be owned by Spadaro or any of the Spadaro Entities.

33. Approximately $2,004,184.65 was found in a CNB account in the name of LM, which was seized as part of the United States pending civil forfeiture action.

34. As of October 10, 2025, Locust's CNB account had a balance of $1,245.96, SMS's CNB account had a balance of $228.93, and EMS's CNB account had a balance of $4,621.20.

35. To date, other than the bank accounts maintained at CNB, I have been unable to identify other assets in the United States that may be available to satisfy a judgment against Spadaro or the Spadaro Entities.

***Spadaro's Residence Overseas***

36. Border crossing data available to me shows the date and flight information each time an individual crosses the Unted States border either inbound or outbound. Review of border crossing data for George Spadaro demonstrates that since July 7, 2019, Spadaro has only been in the United States for 94 days, or approximately four percent of the time.

37. Spadaro has had no recorded inbound border crossings since he left the United States on September 6, 2022.

38. Investigation of open-source information available on social media reveals that George Spadaro (who identifies himself as "Jorge Espedaro" on his public Facebook profile) is actively living and operating various businesses from the Philippines.

39. Various Facebook posts and comments I have reviewed confirm that Spardaro is romantically involved with a Filipino woman named Sakurangi Jen, who goes by "Jen."

40. On July 8, 2023, Spadaro posted a graphic for "Club Tipsy" and described it as "Absolutely the biggest undertaking thus far," thanking "friends, family, workers, contractors, even ones I haven't met" for "all the support in making this day finally come!"

41. Posts by Jen and others indicate that Jen is deeply involved in operating the Tipsy club, and posts by employees of the club describe Spadaro and Jen together as their "bosses."

42. Social media posts and other information publicly available online also indicate that Spadaro and Jen are involved in operating G&J Medical IT Solutions from a call center in Cebu City, Philippines, and Spadaro has made job postings recruiting employees in the Philippines for "G&J Construction."

43. Social media posts as recently as Sunday, October 5 confirm that Spadaro currently remains in the Philippines.

***Amount of the Debt***

44. As set forth in the Complaint filed in this matter and Medicare regulations, certain DME items furnished by Spadaro and the Spadaro Entities to Medicare beneficiaries required a face-to-face encounter with a physician before the prescription could be issued.

45. Based on my investigation, review of claims data, patient complaints, and interviews of physicians and beneficiaries, it does not appear that any of the patients who received DME prescribed by Dr. Martin Perlin, Dr. Govind Seth, or Dr. Oluremi Ilupeju had a qualifying

face-to-face encounter with the referring physician before the DME was ordered and billed to Medicare.

46. Counting only those DME items that required a face-to-face encounter and were ordered by these three physicians, LM submitted 13,207 false and fraudulent claims to Medicare and received approximately $6,350,778.45 in fraudulent payments, and SMS submitted 4,344 false and fraudulent claims to Medicare and received approximately $2,259,384.85 in fraudulent payments.

47. EMS has only been enrolled in Medicare since Oct. 31, 2024, but information received from EMS indicates that EMS billed Medicare and conducted marketing to Medicare beneficiaries based on beneficiary data purchased from third-party marketing companies in violation of the Anti-Kickback statute, 42, U.S.C. § 1320a-7b(b)(4). Through May 17, 2025, EMS had submitted at least 94 false and fraudulent claims to Medicare and has been paid approximately $37,186.04 for these fraudulent claims.

48. Pursuant to the False Claims Act and 28 C.F.R. § 85.5, the United States is entitled to recover civil penalties of between $14,308 and $28,619 per false claim submitted by the Defendants for total minimum statutory penalties of $252,464,660. This minimum civil penalty amount mandated by statute is subject to certain constitutional restrictions, and the final amount of the civil penalties assessed is to be determined by the Court.

49. While the amounts set forth above are certain based on applicable regulations and evidence, additional amounts based on patient complaints, improper purchase of beneficiary data, or other fraudulent conduct may not yet be known. Accordingly, the amounts set forth in this affidavit should be viewed as the minimum of the debt owed to the United States.

***Conclusion***

50. Based on my experience and training and the information I have reviewed during my investigation of this matter, it appears that Spadaro was operating an international fraud scheme with the intent and purpose to obtain fraudulent payments from Medicare.

Executed this 10th day of October, 2025, at Charleston, West Virginia.

Adam Powers
Special Agent, HHS-OIG